UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION - RIVERSIDE

O

JS - 6

| SAAD EL WARDANY, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 5:09-cv-00299 |
| | ) | |
| CITY OF SAN JACINTO, a municipal corporation, and DOES 1 THROUGH 10 INCLUSIVE, | ) ) ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Saad El Wardany ("Plaintiff" or "Wardany") is the owner of a general convenience store in San Jacinto, California. In June 2008, the City of San Jacinto ("the City" or "Defendant") began construction of a mile-long median down a portion of Ramona Boulevard that abuts Plaintiff's property. In this lawsuit, Plaintiff claims that the median has effectively rendered his property "land locked" and caused a substantial loss to his business. (Compl. ¶ 9.) Plaintiff claims, further, that the City wrongfully denied a request from a third-party, Verizon Wireless, for a permit to build a cellular site on Plaintiff's property, and prohibited Plaintiff from posting advertisements on the windows of his convenience store. According to Plaintiff, all of the City's actions, including its refusal to open the median in front of his property, were part of a deliberate plan to drive Plaintiff out of business, purchase his property at a reduced price, and later sell the property to a nearby church. (*Id.* ¶ 14.) Plaintiff has filed this lawsuit under 42 U.S.C. §§ 1982, 1983 and Article I, § 19 of the California Constitution, alleging (1) the City retaliated against him for complaining about the median and treated him differently than other similarly situated property owners in violation his First and Fourteenth Amendment rights (Count I); (2) the City discriminated against him on the basis of his race (Count II); and (3) the City engaged in a taking of his property (Counts I & III). The City denies these claims and maintains that the median was constructed for safety and esthetic

reasons, entirely unrelated to any interest in Plaintiff's business or the nearby church. The City seeks summary judgment on all counts, and for the reasons stated below, the motion is granted.

## FACTUAL BACKGROUND

The following facts are drawn from the parties' Local Rule 56 Statements and are presented in the light most favorable to Plaintiff. L.R. 56-1; *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1099 n.4 (9th Cir. 2011).

### I. Construction of Ramona Boulevard

Plaintiff has owned and operated the "One Stop Market," a convenience store located at 163 S. Ramona Boulevard in San Jacinto, California since 1993. (Compl. ¶ 3.) Plaintiff owns other properties in the surrounding area, as well. (Letter from Wardany to City of 9/10/08, Ex. 31 to Def's Mot. for Summ. J.) In August 2007, the State of California transferred portions of Ramona Boulevard, between State Street and San Jacinto Avenue, to the City of San Jacinto. (Def.'s 56.1 ¶¶ 1-2.) As a condition of the State's relinquishment of this property, the City was required to improve its safety standards for the roadways. (*Id.* ¶ 1.) In response, the City hired a traffic engineering firm, RK Engineering Group, to evaluate existing roadway conditions and make recommendations. (*Id.* ¶ 4.) On January 8, 2008, RK Engineering Group submitted a report to the City in which it outlined recommendations for a major roadway renovation, and specifically addressed the City's concerns regarding the high volume of schoolchildren crossing Ramona Boulevard. (RK Engineering Group Report of 1/8/2008, Ex. 1 to Def.'s Mot for Summ. J.) Soon after receiving the report, the City proposed the construction of a mile-long median along Ramona Boulevard between State Street and San Jacinto Avenue.[1] (Def.'s 56.1 ¶ 2.) The City designed the median to open at almost every intersection along the Boulevard and claims to have considered

---

[1] According to the City, the primary purpose of the median was to slow down traffic for the safety of the public and specifically of schoolchildren attending three nearby schools. (Def.'s 56.1 ¶ 3.) Plaintiff acknowledges that the speed limit along Ramona Boulevard decreased from 45 mph to 35 mph after installation of the median. (Wardany Dep. 70.)

2

the potential effects of construction on all local businesses during this planning stage. (*Id.* ¶ 5.) Plaintiff's property is located approximately 50 yards from one of the median openings at Estudillo Avenue and Second Street.[2] (*Id.* ¶ 50.)

From September 2007 to March 2009, the City held numerous public City Council meetings to discuss its renovation plans for Ramona Boulevard, and specifically, the construction of the median. (Minutes from Regular Meeting of the San Jacinto City Council, Exs. 19-30 to Def.'s Mot for Summ. J.) Each meeting was open to members of the public, and community members were invited to comment on the proposed renovations. (Def.'s 56.1. ¶¶ 12-13.) On May 21, 2008, before construction officially began, the City also sent a letter to all owners of businesses—including Plaintiff—and residences abutting the portion of Ramona Boulevard affected by the median, presenting details on the construction and a timeline for the median's completion. (Ex. 3 to Def.'s Mot.)

Plaintiff denies receiving the City's letter and claims that he could not properly object to the design of the median because the City never personally notified him of any of the public hearings that occurred prior to construction. (Compl. ¶ 8; Pl.'s Resp. at 10.) Once Plaintiff became aware of the construction, he requested construction of a "turn pocket" or break in the median in front of his property.[3] Habib Motlagh, the City's chief engineer, asserts that the City did consider Plaintiff's request, but ultimately determined that such a break in the median was not in the interest of safety

---

[2] Plaintiff's property is located between two median openings on Ramona Boulevard: one at First Street, and the other at Second Street. There is also rear access to Plaintiff's property via a diagonal alleyway between Estudillo Avenue and First Street. (Map of 163 S. Ramona Boulevard, San Jacinto, CA, Ex. 37 to Def.'s Mot. for Summ. J.) *See* Google Maps, http://maps.google.com/maps?oe=utf-8&rls=org.mozilla:en-US:official&client=firefox-a&safe=on&um=1&ie=UTF-8&q=163+S.+Ramona+Boulevard+San+Jacinto,+CA&fb=1&gl=us&hnear=0x880e2c3cd0f4cbed:0xafe0a6ad09c0c000,Chicago,+IL&cid=0,0,15469288944450113739&ei=Xk7eTZHxOozegQfz4MHQCg&sa=X&oi=local_result&ct=image&resnum=1&ved=0CBcQnwIwAA. (last visited May 26, 2011).

[3] Plaintiff does not state when he first became aware of the construction, nor when he first complained.

and found no justification for "singling out" Plaintiff's property, in light of the fact that adequate access to and from Plaintiff's property would remain even after installation of the median. Motlagh notes that someone traveling north on Ramona Boulevard from San Jacinto Avenue toward State Street has the same means of access to Plaintiff's property as was available prior to construction of the median. A southbound driver would have access as well, either by making a left turn onto Estudillo Avenue to access Plaintiff's property from the rear, or by using one of the other nearby side streets. (Motlagh Decl. ¶ 10.) In Motlagh's estimation, a break in front of Plaintiff's property would be misguided, as every property owner along Ramona Boulevard would likely prefer the same benefit; to provide such openings for all property owners would defeat the purpose for the construction of the median in the first place. (*Id.* ¶ 8.) Ultimately, the City proceeded with its plans for the median as designed, and in June 2008, officially began construction. (Ex. 4 to Def.'s Mot. for Summ. J.)

## II. Effects of the Median

Plaintiff claims that at some point after installation of the median, he began to notice reduced sales at his market. In a September 10, 2008 letter to the City, Plaintiff expressed his concerns; and again, requested a median break in front of his property or its entire removal.[4] (Wardany Letter, Ex. 31 to Def.'s Mot. for Summ. J.) Plaintiff also complained that drivers were prevented from accessing his market from the rear because a portion of Estudillo Avenue just west of Plaintiff's property had been converted to a one-way street.[5] (*Id.*) On October 7, 2008, Plaintiff

---

[4] Plaintiff's letter to the City (with no precise department identified as the recipient) stated that the median had caused a 55% drop in sales at the market. (Wardany Letter of 9/10/2008, Ex. 31 to Def.'s Mot. for Summ. J.) Plaintiff's letter also included a petition opposing "the construction . . . of Ramona Boulevard in front of One Stop Market," bearing the signatures of approximately 334 individuals. (*Id.*) Though the court cannot identify all of the individuals' signatures with precision, the court presumes Plaintiff solicited relevant community members.

[5] The portion of Estudillo Avenue that is currently one-way begins at the border of the diagonal alleyway behind Plaintiff's property and runs north until the road reaches a dead-end
(continued...)

received a letter from the City denying his request for removal or modification of the median. (Letter from Ballinger to Wardany of 10/7/08, Ex. 32 to Def.'s Mot. for Summ. J; Wardany Dep. 32.) The City reiterated that means of ingress and egress from Plaintiff's property continue to exist, regardless of the direction one is traveling on Ramona Boulevard. (Motlagh Decl. ¶¶ 7, 10-11.) In his deposition, Plaintiff acknowledged that traffic in the alleyway behind his store still flows freely, as long as there are no activities scheduled at the church across the street, but nevertheless disputes the City's assertion about the number of direct access routes to this property that remain. He cites no basis in the record that rebuts that assertion, however. (Wardany Dep. 117-18.)

## III.     Cellular Tower

Sometime in November 2008, Robert McCormick, a Verizon Wireless representative, applied to the City's Planning Department for a "Conditional Use Permit" to construct a 64-foot cellular tower on Plaintiff's property. (Def.'s 56.1 ¶ 16.) According to the City, Plaintiff's property is located within the Downtown Residential zone of the City's zoning ordinances. In such a zone, the code precludes construction of any structure in excess of 25 feet.[6] (Clayton Decl. ¶ 5.) The City's Information Planner, David Clayton, advised Verizon that in order for Verizon to install a cellular tower in excess of the maximum permitted height, Verizon or Plaintiff would need to apply for a variance or a "change of zone." (Clayton Decl. ¶¶ 11-12.) Clayton and McCormick discussed various options for modifying Verizon's permit application, but after hearing all of the alternatives, McCormick withdrew Verizon's application, leaving nothing for the City's Planning Commission to review. (*Id.* ¶ 13.)

---

[5](...continued)
at First Street; the remainder of Estudillo Avenue (south of the alleyway) is a two-way street. (Motlagh Decl. ¶ 18.) Though neither party has stated when precisely Estudillo Avenue was partially converted to a one-way street, Plaintiff surmised that the conversion happened approximately six or seven months before the median was installed. (Wardany Dep. 125.)

[6]     *See* City of San Jacinto, Zoning Ordinance for Downtown Residential Zone, Article 8D, Ex. 5 to Def.'s Mot. for Summ. J.

5

Plaintiff has presented no details concerning his dealings with Verizon Wireless, but he asserts that at some point, he and Verizon entered into a contract for Verizon to construct a cellular tower on his property.[7] (Compl. ¶¶ 11-12.) Plaintiff claims Verizon obtained verbal approval for the cellular tower from the City, but that when Plaintiff himself accompanied McCormick to pay the application fee for the tower (on a date Plaintiff does not recall), Clayton saw Plaintiff's face and denied the permit. (Wardany Dep. 139.) When pressed further about this encounter at his deposition, Wardany admitted that Clayton did not flatly deny the permit, but rather explained to Plaintiff that, as proposed, the tower exceeded the maximum height allowed under the zoning laws. (*Id.* 141-43.) Plaintiff does not respond to the City's assertion that Verizon simply withdrew the application; Plaintiff admits, however, that neither he nor Verizon ever submitted a revised application or applied for a variance or change of zone. (*Id.* 144.)

## IV. Signage Violations

In addition to rules regarding construction within the Downtown Residential zone, the City has enacted guidelines regarding permissible signage and advertising on commercial buildings.[8] According to the City, impermissible signage on buildings is a ubiquitous and persistent problem, and because its resources are limited, the City has chosen to seek enforcement of the rules primarily through voluntary compliance and verbal warnings. (Def.'s 56.1. ¶ 27.) The parties agree that on a number of occasions, Plaintiff received warnings about impermissible advertisements on the windows of his property, but he always complied with the City's requests to remove such signage, and has never been fined or penalized. (Hallberg Decl. ¶ 14; Wardany Dep. 173, 252.) Phil Hallberg, the City's Acting Code Enforcement Manager, recalls that on those occasions when

---

[7] Plaintiff has not provided any documentation reflecting his contract with Verizon Wireless and has not disclosed when he reached this agreement.

[8] *See* City of San Jacinto Sign Guidelines, Article 16. (Ex. 8 to Def's. Mot. for Summ. J.)

6

he issued a Notice of Violation for impermissible signage to Plaintiff, his interactions with Plaintiff were always polite and there was never had any verbal altercation.[9] (Hallberg Decl. ¶¶ 16, 18.) Plaintiff was even issued a temporary use permit for his signs on February 21, 2008. (Wardany Dep. 218.) According to Plaintiff, however, the signage issue became acrimonious at some point after the City began construction of the median in June 2008. According to Plaintiff, on a date not specified, an unidentified City employee removed advertisements from Plaintiff's store window. Plaintiff was not present for this incident, but his wife, Mirvat Ebrahim Aziz, reported that when she protested about the removal of the advertisements, the City employee allegedly said to her, "'Bring me someone I can talk to in English.'" (Aziz Dep. 17, Ex. J to Pl.'s Opp. To Def.'s Mot. for Summ. J.; Wardany Dep. 94.) Plaintiff claims that he immediately reported this incident to Timothy Hults, Assistant City Manager. There appears to be no dispute that the signs in fact violated City regulations, but Hults nonetheless later ensured that the signs were returned to Plaintiff. (Wardany Dep. 95.)

After this incident, Plaintiff came to believe that the City's rules regarding signage were not enforced properly or equally. On August 27, 2008, Plaintiff submitted a complaint to the City identifying several businesses in the surrounding area that appeared to violate the City's signage rules. (Hallberg Decl. ¶ 4.) Hallberg received that complaint on September 2, 2008, claims that he immediately recognized the property addresses Plaintiff identified, and within a day or two, followed up with the property owners to request that they either remove their improper signage or obtain valid permits. (Hallberg Decl. ¶¶ 5-6.)

---

[9] Hallberg does not recall the dates on which he spoke with Plaintiff or his wife about the signage on their property. (Hallberg Decl. ¶ 15.)

## V. The San Jacinto Assembly of God Church

At bottom, Plaintiff believes that all of the above described actions taken by the City were part of the City's larger scheme to drive Plaintiff out of business in order to purchase his property at a reduced price, and later transfer the property to the San Jacinto Assembly of God, a church just west of Plaintiff's property. (Compl. ¶ 14.) To support his assertions, Plaintiff claims that a pastor named Jordan Heston had approached Plaintiff about the church's possible purchase of Plaintiff's property some five or six years before his March 2010 deposition. (Wardany Dep. 36-37.) Yet Plaintiff admits that no City employee has ever asked him to sell his property to the City or mentioned transferring his property to the church. (*Id.* 51-52.) Moreover, the City claims that it has no intention to acquire Plaintiff's property through any means, and that the church has not approached the City about purchasing Plaintiff's property. (Hults Decl. ¶ 6-7.)

In response to what he perceives as the City's deliberate effort to harm his business, Plaintiff filed this three-count complaint pursuant to 42 U.S.C. §§ 1982 and 1983 and Article I, § 19 of the California Constitution. Plaintiff alleges several claims: (1) the City violated his constitutional rights under the First and Fourteenth Amendments (Count I); (2) the City discriminated against him on the basis of his race (Count II); and (3) the City engaged in a taking of his property in violation of the Fifth Amendment and Article I, § 19 of the California Constitution (Counts I & III).

## ANALYSIS

Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, a plaintiff must present "'significant probative evidence tending to support'" the complaint. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Gen. Bus. Sys. v. N. Am.*

*Philips Corp.*, 699 F.2d 965, 971 (9th Cir. 1983) (citations omitted)). Thus, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**I.     Count I: § 1983 Claims**

Count I of Plaintiff's complaint asserts the following causes of action under § 1983: (1) claims under the Petition and Establishment Clauses of the First Amendment; (2) claims under the Equal Protection and Due Process Clauses of the Fourteenth Amendment; and (3) a federal taking claim. The court addresses each claim in turn.

**A.     First Amendment Claims**

Plaintiff has alleged two separate First Amendment claims against the City. First, Plaintiff argues that the City violated the Petition Clause by engaging in unspecified retaliatory actions after Plaintiff requested a modification of the median design. Second, Plaintiff contends that the City's alleged plan to transfer his property to the nearby Assembly of God Church violates the Establishment Clause. Defendant argues that Plaintiff has presented no evidence to support either allegation, and the court agrees.

**i.     Petition Clause**

Plaintiff does not fully elaborate the basis of his claims under the Petition Clause, but the court understands he contends that the City retaliated against him after he requested that the City remove the median or change its design. The First Amendment guarantees "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. In order to prove a § 1983 claim for retaliation, a plaintiff must establish that: "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected

activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel School Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citing *Pinard v. Clatskanie School Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)).

It is uncontested that Plaintiff's petitions to modify the median, as well as his complaints about signage violations in his neighborhood, were protected by the First Amendment. Plaintiff offers no evidence, however, of any causal relationship between those petitions and any adverse action taken by the City. Plaintiff himself does not identify specific instances of retaliation, and as the court reads the record, the only adverse actions that could support any retaliation claim are (1) the denial of Plaintiff's cellular tower permit application and (2) the citations Plaintiff received for signage violations. But even viewing the evidence in the light most favorable to Plaintiff, the court is unable to draw any inference of retaliation in these circumstances. As Defendant points out, the City's zoning regulations did not permit the Verizon Wireless cellular tower as proposed, and neither Plaintiff nor Verizon ever sought to submit a revised application. Instead, Verizon Wireless withdrew the application, and the City made no ruling on it. Moreover, David Clayton—the City's Information Planner—stated that he had no knowledge of Plaintiff's petition regarding the median at the time he was tasked with reviewing the cellular tower application. (Clayton Decl. ¶¶ 9-10.)

As for the citations Plaintiff received for his signage violations, Plaintiff does not challenge the legitimacy of the City of San Jacinto's regulations regarding advertisements in business windows—Plaintiff himself applied for and received a permit for his signage on February 21, 2008. (Wardany Dep. 218.) In any event, Plaintiff never received a formal penalty or fine for his code violations. Even if the court were to construe the citations as adverse action, there would be no basis for a finding of retaliation because Plaintiff presents no evidence of any causal connection between his petitions to the City and the citations. In fact, the timing of the citations Plaintiff received is not obviously consistent with a retaliatory motive: Plaintiff received citations for signage violations both before and after he complained about the median project. Because Plaintiff has not

met his burden of demonstrating that the City retaliated against him for exercising his First Amendment right to seek redress of his grievances, the City is entitled to summary judgment on the Petition Clause claim.

### ii. Establishment Clause

As explained above, Plaintiff believes that the City refused to construct a break in the median in front of Plaintiff's property as part of a deliberate scheme to cause a depreciation in Plaintiff's business so that it could ultimately sell the property to the nearby Assembly of God Church. Plaintiff contends that such a scheme violates the Establishment Clause. The Constitution prohibits a "law respecting an establishment of religion . . ." and government policies must not foster an excessive "entanglement with religion." U.S. CONST. amend. I; *see Widmar v. Vincent*, 454 U.S. 263, 271 (1981); *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). In this case, however, Plaintiff merely alleges, without any accompanying factual support, that the City has a plan to quash his business in favor of the church. (The court notes that, were the church to use Plaintiff's property, churchgoers would presumably have the same access problems that Plaintiff's patrons experience as a result of the median.) Plaintiff offers absolutely no reason that the City would have been motivated to transfer his property to the church, and even if there were such evidence, Defendant correctly observes that Plaintiff's claim is not ripe; Plaintiff still owns his property and the City has made no offers to purchase it. (Hults Decl. ¶ 7; Wardany Dep. 51-52.) Because Plaintiff has alleged no facts from which the court can infer that the City has planned or threatened to sell his property to the church, the City is entitled to summary judgment on Plaintiff's Establishment Clause claim.

### B. Fourteenth Amendment Claims

Plaintiff alleges two Fourteenth Amendment claims: (1) the City violated his rights to due process by failing to give him individualized notice of the median project before construction began;

and (2) the City violated equal protection by treating him differently from other similarly situated property owners in San Jacinto on the basis of his race and nationality. (Compl. ¶ 18.)

### i. Due Process

Plaintiff alleges that he was "exceptionally affected" by the median project, and entitled to individualized notice and a hearing on the matter before construction began. (Pl.'s Resp. at 6-7.) Plaintiff therefore argues there is a triable issue of fact regarding whether the City violated his procedural due process rights. The due process clause of the Fourteenth Amendment protects individuals against government deprivations of property without due process of law. U.S. CONST. amend. XIV, § 1. The Ninth Circuit has held that "[a] §1983 claim based upon procedural due process . . . has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).

Defendant contends there are no disputes on any of these elements. The City contends that Plaintiff has not established that he was actually deprived of any property interest because his property ownership has not been significantly changed or altered as a result of any action by the City. (Def.'s Mot. for Summ. J. at 20.) Whether an individual has a property interest to which due process attaches is a question of state law, *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989), and under California law, "the right of a property owner to ingress and egress is not absolute." *People ex rel. Department of Public Works v. Ayon*, 54 Cal.2d 217, 223, 352 P.2d 519 (Cal. 1960); *see also People By and Through Dept. of Public Works v. Becker*, 262 Cal. App. 2d 634, 69 Cal. Rptr. 110 (4th Dist. 1968); *People v. Ricciardi*, 23 Cal. 2d 390, 144 P.2d 799 (1943). Thus, some of Plaintiff's customers may now be required to traverse a more circuitous route in order to access Plaintiff's business, but as Defendant rightly argues, losing "the right to make a

12

direct left hand turn into [the One Stop Market]" is not a deprivation of any protected property interest. (Def.'s Reply at 2.)

Even assuming Plaintiff had suffered a deprivation in this case, his further claim that he was entitled to individualized notice and hearing is unavailing. In *Harris v. County of Riverside*, 904 F.2d 497, 498 (9th Cir. 1990), a landowner sued after the county re-zoned his property, causing a change in the permissible uses of his land. In evaluating whether the county was required to comply with due process, the Ninth Circuit found that the landowner was "exceptionally affected . . . on an individual basis" given that the zoning decision concerned a relatively small number of persons. *Id.* at 502. In *Halverson v. Skagit County*, 42 F.3d 1257, 1258-59 (9th Cir. 1994), residents whose property was damaged by flood waters filed a suit against the county, arguing that the county failed to notify them that the levee system would divert flood waters onto their property. The Ninth Circuit found no due process denial. In contrast to *Harris*, where a single landowner was "exceptionally affected" by the county's action, *Harris*, 904 F.2d at 502, the Ninth Circuit explained that "governmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." *Halverson,* 42 F.3d at 1261 (and *cases cited therein*). In this case, while Plaintiff's use of his property may have been altered because of the median, the construction did not "exceptionally affect" him on an individual basis. Plaintiff is one of more than a hundred residents who own property abutting Ramona Boulevard.[10] Moreover, even though Plaintiff denies receiving the May 2008 letter from the City regarding the construction timeline, the plans for the median were discussed at numerous public City Council Meetings from September 2007 to March 2009, all of which were noticed and open to the public.

---

[10] The City estimates that the median currently affects approximately 108 properties bordering Ramona Boulevard. (Def.'s Reply at 7.)

(*See* Exs. 19-30 to Def.'s Mot. for Summ. J.)  Plaintiff has not established that he was entitled to any greater protection.

        ii.        **Equal Protection**

In support of his Fourteenth Amendment equal protection claim, Plaintiff alleges that he was intentionally treated differently from other similarly situated property owners on the basis of his race and nationality.  The Equal Protection Clause guarantees, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.  In order "[t]o succeed on a § 1983 equal protection claim, the plaintiff[] must prove that the defendant[] acted in a discriminatory manner and that the discrimination was intentional." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (citing *Federal Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991)).  Thus, to avoid summary judgment, a plaintiff must "'produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the] decision . . . was racially motivated.'" *Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 754 (9th Cir. 2001) (quoting *FDIC v. Henderson*, 940 F.2d 465, 473 (9th Cir. 1991)).  Plaintiff fails to meet this test because he has offered no evidence of unequal treatment.

To support his race discrimination claims against the City, Plaintiff points to his wife's account of the incident in which an unidentified City code enforcement officer removed improper signage from his property.  Plaintiff's wife, Mirvat Ebrahim Aziz, testified at her deposition that the officer observed that she spoke little English and said: "'Bring me someone I can talk to in English.'" (Aziz Dep. 17, Ex. J to Pl.'s Opp. To Def.'s Mot. for Summ. J.)  Plaintiff sees this incident as evidence that the City and its employees know he is Arabic Egyptian. (Compl. ¶ 6.)  Whatever the wisdom of the officer's demand to speak to someone other than Plaintiff's wife, or the courtesy with which it was uttered, the court is not satisfied that this episode is sufficient to establish a dispute

of fact concerning Plaintiff's claim that the City engaged in intentional race discrimination when it enforced the signage regulations.

Plaintiff also claims that the City failed to equally enforce the rules regarding signage with respect to other neighboring businesses. Yet Plaintiff has presented no evidence to support this assertion and no evidence that the City enforced its rules in a racially discriminatory fashion.[11] In fact, during his deposition, when asked whether he had "ever heard anyone at the City say anything bad about your race or ethnicity or national origin," Plaintiff backed off from any direct national origin discrimination claim and instead returned to his theory that the City favored the local church: "I don't think I heard anything, no. He not say anything about my nationality and it's not coming from my nationality . . . [It's] coming because he want to give me hard time until I sell the store to the church."[12] (Wardany Dep. 98-99.) Asked later in his deposition whether there had been any other reference to his race, Plaintiff responded: "No, they not say it direct . . . ." (Wardany Dep. 259.) This exchange may not constitute a concession, as the City argues, but it does cast doubt on any notion that a genuine dispute of fact exists about his race discrimination claim. In sum, Plaintiff has presented no evidence from which the court can conclude that there is a genuine dispute of fact as to whether the City engaged in intentional race discrimination. Summary judgment is granted on this claim.

---

[11] The City has offered a legitimate non-discriminatory reason for any perceived inconsistent treatment concerning signage violations: limited resources. According to the City's Code Enforcement Manager, Phil Hallberg, the City strives to obtain compliance with the signage ordinance through verbal requests and warnings, but some property owners fail to comply, and Hallberg is the sole person in the City responsible for enforcement. (Hallberg Decl. ¶¶ 10-12.) Plaintiff was not singled out for his signage violations, Hallberg asserts, and he submitted copies of several Notices of Violations that he issued to surrounding property owners after he received Plaintiff's complaint about those violations. (*See* Ex. 16 to Def.'s Mot. for Summ. J.)

[12] The court is uncertain who Plaintiff is referring to as "he."

**II.     Counts I & III: Federal Taking Claim & Inverse Condemnation Claim**

In his complaint, Plaintiff alleges that City engaged in a taking of his property in violation of the Fifth Amendment (Count I) and Article I, § 19 of the California Constitution (Count III). (Compl. ¶ 18.) A regulatory taking occurs "when the value or usefulness of private property is diminished by a regulatory action that does not involve a physical occupation of the property." *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 965 (9th Cir. 2003). In this case, the City has not required Plaintiff to dedicate part of his property for public use, nor did the City exercise its eminent domain power; Plaintiff still possesses his property, and the City has taken no action to restrict his possession or use. Plaintiff is left to argue only that the median on Ramona Boulevard has resulted in diminished sales at his store. Yet the Ninth Circuit has held that "a land use regulation does not constitute a taking if the regulation does not deny a landowner all economically viable use of the property and if the regulation substantially advances a legitimate government interest." *Buckles v. King County*, 191 F.3d 1127, 1140 (9th Cir. 1999). Here, Plaintiff offers an unsubstantiated claim that his sales have decreased by 55% since the median was installed (Wardany Letter, Ex. 31 to Def.'s Mot. for Summ. J.), but even such a loss does not constitute a denial of all economically viable use.

Plaintiff's inverse condemnation claim under California law is similarly flawed. California courts have recognized that a property owner's right of access is not unlimited: "Not every interference with the property owner's access to the street upon which his property abuts and not every impairment of access, as such, to the general system of public streets constitutes a taking which entitles him to compensation." *Border Business Park, Inc. v. City of San Diego*, 142 Cal. App. 4th 1538, 1557, 49 Cal. Rptr. 3d 259, 274 (Cal. App. 4th Dist. 2006) (quoting *Breidert v. Southern Pac. Co.*, 61 Cal. 2d 659, 663–64, 39 Cal. Rptr. 903, 394 P.2d 719 (1964)). In *People ex rel. Department of Public Works v. Ayon*, the Supreme Court of California faced a factual

circumstance roughly similar to the instant case: after the City of Azusa condemned a ten-foot wide strip of property, supermarket owners, brought suit claiming that the construction of a metal divider in the resulting widened roadway would restrict access to their property. 54 Cal.2d at 221. The court concluded that the property owners were not entitled to damages and explained that "a property owner has no constitutional right to compensation simply because the streets upon which his property abuts are improved so as to affect the traffic flow on such streets." *Id.* at 224. Here, the evidence fails to establish that ingress or egress from Plaintiff's property has been completely obstructed. Plaintiff has failed to allege a cognizable taking claim under either the Fifth Amendment or the California Constitution.

## II. Count II: § 1982 Claim

Section 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Though not often invoked today, the statute was originally designed to deter and prohibit race discrimination in the sale or rental of property. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 419, 421 (1968). In *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 552 (9th Cir. 1980), for example, black rental applicants were told that the office space which they sought to rent was unavailable, yet the same space was rented to a white applicant the following day. *Id.* at 552. The defendant hotel owners argued that they had rented rooms to black boarders in the past, but the Ninth Circuit was satisfied that plaintiffs had established a claim under § 1982 and observed: "Where the evidence so clearly speaks to racial exclusion in a particular instance of refusal to rent office space, evidence of non-discriminatory conduct may properly be found not to constitute a valid defense." *Id.*

Wardany has offered no evidence of racial exclusion. In fact, Plaintiff fails to develop his § 1982 claim entirely, and the record does not support such a claim. *See Githere v. Consolidated*

*Amusement Corp. Inc.,* 258 Fed. Appx. 122, 124 (9th Cir. 2007) ("[T]he nonmoving party cannot defeat the motion [for summary judgment] by merely relying on the allegations in the pleadings . . . ."). There is no indication in this record that the City in any way interfered with Plaintiff's right to "inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Plaintiff's own "conclusory allegations and unwarranted inferences are insufficient" to maintain his claim. *West Coast Theater Corp. v. City of Portland*, 897 F.2d 1519, 1527 (9th Cir. 1990) ("Racial discrimination must be shown to state a colorable § 1982 claim."); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citation omitted) (the court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [33] is granted as to all claims.

ENTER:

Dated: May 27, 2011

_____
REBECCA R. PALLMEYER
United States District Judge